[Cite as *State v. Brofford*, 2013-Ohio-3782.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,           CASE NO. 14-12-07

      v.

WESLEY J. BROFFORD,           O P I N I O N

      DEFENDANT-APPELLANT.

---

Appeal from Union County Common Pleas Court
Trial Court No. 11 CR 0033

**Judgment Affirmed**

Date of Decision: September 3, 2013

---

APPEARANCES:

    *Russell S. Bensing* **for Appellant**

    *David W. Phillips and Melissa A. Chase* **for Appellee**

Case No. 14-12-07

**WILLAMOWSKI, J**.

{¶1} Defendant-Appellant, Wesley Brofford ("Wesley Brofford" or "Wes"), appeals the judgment of the Union County Court of Common Pleas, sentencing him to three years in prison after a jury found him guilty of felonious assault. On appeal, Wesley Brofford contends that the trial court erred in excluding extrinsic evidence of a prior inconsistent statement of a State's witness. For the reasons set forth below, the judgment is affirmed.

{¶2} On February 28, 2011, the Union County Grand Jury issued an indictment charging Wesley Brofford with one count of felonious assault pursuant to R.C. 2903.11.(A)(1), a felony of the second degree, alleging that he caused serious physical harm to Jonathan P. Kelley ("Jonathan"). The indictment arose out of an incident which occurred shortly after midnight on January 23, 2011, on the Broffords' property. Wesley's father, Scott W. Brofford ("Mr. Brofford"), was also indicted for felonious assault and other charges arising from the same incident. Both cases were tried together in a four-day jury trial on August 23-26, 2011.

{¶3} The incident giving rise to the charges began late on the evening of January 22, 2011, when 17-year-old Jonathan was hanging out and drinking beer with two of his friends, 18-year-old Luke Parrish ("Luke"), and 20-year-old

Michael Gayle ("Michael"). Also present were two girls, Ashley Winterstellar ("Ashley") and Taylor Watkins ("Taylor").

{¶4} Late that evening, Jonathan received a call from his stepbrother telling him that he had recently had an altercation with Nick Sparks ("Nick") and some of Nick's friend. Nick and these friends were also friends of Jonathan, and Jonathan was upset about what had occurred. Jonathan called Nick, who was at the Broffords' house. Nick and several of his friends had also been hanging out together and drinking beer and playing beer pong at the Broffords' house, even though they were also underage. The conversation did not go well and apparently Nick told Jonathan to come out to the Broffords' so they could "settle" things, or perhaps so that Nick could beat him up. (Tr. 8/23, pp. 36, 202) Jonathan was "pretty fired up" after the conversation, and wanted to go out to the Brofford house to either "confront" Nick, or "to fight" with him, according to the testimony of the different witnesses. (Tr. 8/23, p. 40; Tr. 8/24, pp. 35, 175).

{¶5} Jonathan, Luke and Michael drove to the Broffords' place in Jonathan's Honda Civic (owned by Jonathan's mother). While they were driving, Jonathan made several more calls to Nick to let him know they were coming. (Tr. 8/23, pp. 37, 39) Ashley and Taylor also drove to the Broffords' in Ashley's vehicle and parked near the Honda.

{¶6} As soon as they arrived at the Brofford place, Jonathan got out of his car, and Nick came out of the house, followed by a number of the other young men and women who were at the Brofford house, including Tory Stover ("Tory"), Devon Kiss ("Devon"), William Converse ("Billy"), and the Appellant, 18-year-old Wesley Brofford.

{¶7} Jonathan and Nick yelled at each other and exchanged words at first. Then Jonathan pushed Nick, who then punched Jonathan. They traded punches for a while until Nick tackled Jonathan to the ground. (Tr. 8/23, pp. 45-46)

{¶8} While Jonathan was on the ground with Nick on top of him, Nick kept pummeling Jonathan, and one or more of the others battered and kicked Jonathan numerous times around his head and face. The witnesses who testified sometimes presented varying details about the fight and about whom they actually saw kicking Jonathan.[1]  Often the discrepancies were due to their location and what they could see, the fact that there was a lot of commotion and activity going on in multiple locations over a fairly short period of time (5-10 minutes), and because they were also preoccupied with their own situation.

{¶9} Jonathan, for instance, testified that he didn't see everyone who kicked him because he was otherwise trying to cover his face to protect himself,

---

[1] In fact, several of the witnesses gave statements to the police that evening, or shortly thereafter, identifying Aaron Brofford, Mr. Brofford's younger son, as one of the people kicking Jonathan. Aaron was also charged, as a juvenile. Later, it was learned that the witnesses were mistaken and that Aaron was upstairs in his room the entire time. The charges against Aaron were dismissed.

and he was reeling from the effects of the hard blows. (Tr. 8/23, pp. 47-48) He did see Tory kick him. He knew he was surrounded by Wesley, Mr. Brofford, and others, and felt himself getting kicked multiple times. (*Id.* at 50) He remembers Tory kicking him and saying "this is what you get for coming out here sticking up for your brother." (*Id.* at 49) He also testified that Mr. Brofford was "was up in my face saying 'this is what you get.'" (*Id.*) He said that Mr. Brofford was the last person to kick him "right before I got up is when – is when I got kicked the hardest." (*Id.* at 111) When Jonathan got up, he remembers seeing Wesley Brofford and Mr. Brofford there. (*Id.* at 50)

{¶10} Luke testified that he was trying to tell Billy and Tory and some of the others to stay out of the fight and let it be a "one-on-one." (Tr. 8/23, p. 148) However, Mr. Brofford then came up and hit Luke in the head, and was chasing him around the car, trying to get to him, while yelling and threatening him. (*Id.* at 148-150.) Luke also testified that he saw a group standing around Jonathan and kicking him. He didn't see some of the bystanders kicking Jonathan, but he testified that he was "100 percent sure that [Mr. Brofford], Wes Brofford, and Tory Stover were." (*Id.* at 154) He saw more people there, but didn't see if they were actually kicking him. (*Id.* at 169)

{¶11} Michael testified that he saw Tory kick Jonathan first, but then he also saw Nick, Mr. Brofford, and Wesley Brofford kick him too. (*Id.* at 207) He

also heard Mr. Brofford yell "get him" and "beat his ass and make sure they never come out here again." (*Id.* at 206) Michael testified that he believed Mr. Brofford kicked Jonathan more than once, but he only actually saw him kick him one time. "I witnessed [Jonathan] laying on his face with his face turned towards Mr. Brofford. And Mr. Brofford kind of like speed walking up to him and kicked him in his face. Flat out in front in his face, not the side of his head, not in the back of his head. He kicked him in his face. * * * " (*Id.* at 210) Michael testified that he was not involved in the fight, other than to try to break it off when he pulled Nick off Jonathan. (*Id.* at 209; Tr. 8/24, p. 19)

{¶12} Ashley testified that she saw Mr. Brofford hit Luke and chase him around the car, and that Mr. Brofford was also standing by Jonathan and yelling and encouraging them to "beat his ass." (Tr. 8/24, pp. 168-169) She testified that she saw Billy, Mr. Brofford and Wesley kicking Jonathan. (*Id.* at 170)

{¶13} Devon testified that he had seen Tory, Billy, and Wesley Brofford cheering Nick on to win, and that he had seen Mr. Brofford go up to Luke and hit him on the head when Luke tried to get the others to let it be a "one-on-one" fight. (Tr. 8/24, pp. 213-214) Devon testified that he heard Mr. Brofford telling everyone to get off his property and telling Nick to "whop his ass." (*Id.* at 215)

{¶14} Devon then went back inside, thinking the fight was over after Nick was pulled off Jonathan, but when he turned and stepped onto the porch to go back

outside, he said that he saw "they were all in a group, and their legs were coming back and I heard a horrible sound and they were all kicking him." (*Id.* at 217)

> Q. Who is "they," Devon?
>
> A. Wes Brofford, Tory Stover, Billy Converse, [and] [Mr. Brofford] made his way over to the pile at this time. And I seen all them kicking him.
>
> * * *
>
> Q. And you were able to hear – and what did the sound sound like?
>
> A. It was the worst sound of my life. It was a thud and over and over and I could hear it. Once I stepped back inside, I could still hear that sound. * * *

(*Id.* at 217-218)

{¶15} When the fighting stopped, Jonathan's friends were very concerned about his condition and they carried him to his car in order to take him to the hospital. They were delayed in leaving because the keys had been lost in the melee. While they were attempting to leave, Mr. Brofford was yelling at them to get off his property. Several testified that Mr. Brofford threatened to get his gun. Also, while they were trying to leave, Mr. Brofford hit the Honda's spoiler and broke it, while others were kicking at the car. Someone broke off the side-view mirror.

{¶16} They were unable to locate Jonathan's keys, so Luke, Michael, Ashley and Taylor then helped get Jonathan into Ashley's car and they drove

away. Luke called his father on the way and arrangements were made to meet an EMT ambulance at a nearby parking lot. They met with the paramedics and Jonathan was transported to the emergency room.

{¶17} Dr. Matthew Sanders, the emergency room physician who treated Jonathan, testified that Jonathan had abrasions, lacerations and contusions and bruising, with swelling and with dried blood about the face. (Tr. 8/24, p. 74; Ex. 43) Fortunately, there was no loss of consciousness and there were no fractures. (Tr. 8/24, pp. 82-83) The CT scan did not show any intracranial hemorrhage or edema. (Ex. 43) Jonathan was treated and given pain medications in the hospital and told to continue to take them to combat the pain. He was then released and instructed to follow-up with his own physician.

{¶18} There was also testimony from two other physicians who treated Jonathan after the initial ER visit. Dr. Jennifer Morrison, an ophthalmologist, testified about his appearance and the condition of his eyes, and the fact that this trauma to his eyes puts him at a slightly greater risk for complications as he grows older. (Ex. 45) Dr. Justin Krueger was a specialist in pediatrics and internal medicine who also treated Jonathan and testified at the trial as to in the injuries that he observed. (Tr. 8/25, pp. 5-126; Ex. 44)

{¶19} Dr. Timothy Treece, a plastic surgeon with considerable experience in facial and head injuries, testified as an expert witness on behalf of the defense.

(Tr. 8/25, 142-179; Defendants' Ex. 8)  Dr. Treece testified that, although Jonathan's injuries may have been traumatic to look at, they were not major life-threatening injuries.  (Tr. 8/25, p. 150)  He testified that he believed the injuries were more consistent with punching, rather than kicking, but acknowledged he couldn't say for certain if an injury came from a punch or a kick.  (*Id.*, pp. 157; 171)

{¶20} In addition to the above witnesses, the jury heard testimony from Luke's father, Jonathan's mother, a BCI witness (some blood that was retrieved from Wesley Brofford's shirt contained DNA consistent with Jonathan's DNA), and Deputy Matthew Henry, from the Union County Sherriff's Department, who investigated the matter.  A tape was also played for the jury of Deputy Henry's initial interview with Mr. Brofford and Wesley, wherein they both denied any involvement in the incident, and claimed that they had not even been outside.  (Ex. 47)  Mr. Brofford had also told the deputy that Nick and several of the others had left earlier, and denied knowledge of any physical fight.  (*Id.*)

{¶21} After hearing all of the evidence, the jury returned guilty verdicts for both Wesley Brofford and his father.[2]  Wesley Brofford was sentenced to three years in prison, and restitution was ordered to be paid.  The trial court granted the

---

[2] The jury found Mr. Brofford guilty of five of the six counts; they found him not guilty of one of the counts of aggravated menacing.  Mr. Brofford was sentenced to a total of four years in prison and is also appealing this decision in 3d Dist. App. No. 14-12-08.

Appellants' motion to stay the sentences and to release Wesley Brofford and Mr. Brofford on bond, pending the outcome of their appeals.

**{¶22}** It is from this judgment that Wesley Brofford now appeals,[3] raising the following assignment of error for our review.

### Assignment of Error

**The trial court erred in excluding extrinsic evidence of a prior inconsistent state of a State's witness.**

**{¶23}** In his sole assignment of error, Wesley Brofford complains that he was not permitted to impeach the testimony of Devon with extrinsic evidence of an inconsistent statement allegedly made by Devon to the defendants' investigator. At trial, Devon testified that he had seen Tory kick Jonathan and that he had also seen Mr. Brofford and Wesley kick Jonathan. However, Wesley claims that Devon had previously told the defense investigator, Jennifer Ruffing ("Ms. Ruffing") that "he had *only* seen Tory Stover kick [Jonathan]." (Emphasis added; Appellant's Br., p. 7) On cross examination, Devon was briefly asked, "Have you previously stated that Tory Stover is the only person you saw kick him?" (Tr. 8/24, p. 241) Devon answered, "No." (*Id.*)

---

[3] The Broffords appealed from the trial court's first J.E. of Sentencing, filed October 4, 2011, but this court remanded the matter because the order did not specify the amount of restitution to be paid and was, therefore, not a final appealable order. The Broffords then appealed from the trial court's second J.E. of Sentencing, filed on February 9, 2012. However, this appeal was stayed while the matter was remanded to the trial court to correct the sentencing order to include conditions of post-release control. The appeal was reinstated after the third J.E. of sentencing was filed on May 29, 2012.

{¶24} Wesley claims that he wanted to impeach Devon with his prior statement to the investigator but the trial court would not permit Ms. Ruffing to testify. He claims this was "a discovery sanction," because he had not provided the State with a copy of the witness's statement under the reciprocal discovery obligations set forth in the recently amended Crim.R. 16 (effective 7-1-10).

{¶25} Therefore, at the conclusion of the testimony on August 24th and 25th, Wesley proffered the statements of two witnesses. The record shows that from 4:35 p.m. to 4:38 p.m. on August 24th, a "proffered" cross-examination of Devon was conducted by defense counsel, out of the hearing of the jury and the judge. (Tr. 8/24, p. 266) At this time, defense counsel asked more detailed questions as to whether Devon recalled speaking to Ms. Ruffing and what he had told her.

> Q. Did you tell Miss Ruffing that right after that, that sound, that you saw Tory getting ready to kick and you heard the worst sound in your life?
>
> A. Yes.
>
> Q. You told her that?
>
> A. Yes.
>
> Q. Did you then tell her that you went inside the house right after that?
>
> A. I don't recall what I told her.

Q. Did you tell her that you didn't see anyone else kick Jonathan after that?

A. I don't recall telling her that.

Q. Did you dispute that you said that?

A. What do you mean?

Q. Are you saying you did not say that to her or you just don't recall?

A. I said I don't recall. I could have.

Q. You may have said that to her?

A. Yes.

(Tr. 8/24, 268-269).

{¶26} The following day, after the jury had exited the courtroom, the record shows that from 4:39 p.m. to 4:41 p.m., defense counsel proffered the following testimony of Ms. Ruffing.[4] (Partial Tr. of Proceedings, 8/24, pp. 3-4)

Q. You spoke to Devon Kiss at some time?

A. Correct.

Q. Do you recall the date on which you spoke with him?

A. I do not.

---

[4] The record at the conclusion of the trial on 8/25, after indicating that the jury left the courtroom, contains the following statement: "THEREUPON, THE PROFFERED EXAMINATION OF JENNIFER RUFFING BY DEFENSE COUNSEL IS NOT AVAILABLE BY DIGITAL RECORDING. THE EQUIMENT WAS ACTIVATED FOR THE EXAMINATION, BUT DUE TO UNKNOWN REASONS, WAS NOT RECORDED." (Tr. 8/25, p. 181) Defense counsel had filed a Joint Motion for 9(E) Certification with this Court in November 2012. However, the recording was located and was transcribed in a supplemental transcript, so it was not necessary to proceed with the App.R. 9(E) motion (which had never been verified by the State or the trial court).

Q.  Was it after January 23rd, 2011?

A.  Yes.

Q.  Who, if anyone, did Devon say kicked [Jonathan]?

A.  Devon Kiss told me that Tory Stover kicked [Jonathan]?

Q.  Did he indicate that anyone else kicked [Jonathan]?

A.  No.

(Partial Tr. of Proceedings, 8/24, p. 4)  That exchange concluded the brief proffer of Ms. Ruffing's testimony.

{¶27} On appeal, Wesley contends that the trial court erred when it excluded the extrinsic evidence of Devon's alleged prior inconsistent statement. He claims that the trial judge had excluded the investigator's testimony "on the grounds that the [investigator's] statement had not been previously disclosed to the State in discovery," pursuant to Crim.R. 16 (Joint Motion for Stay of Execution of Sentence, p. 2)  Wesley argues that the trial court's decision was in error because Crim.R. 16 does not require a defendant to turn over a statement made by the State's own witness, especially when the statement was only to be used for impeachment purposes; that Evid.R. 613 permits extrinsic evidence of a prior inconsistent statement; and, that the exclusion of Devon's testimony was not harmless error in that he claims Devon's testimony was more significant than that of the other witnesses because Devon was the only truly "independent" witness

out of the five eye-witnesses who testified. Wesley alleges Devon's testimony would have more significance to the jury because he was friends with all of those involved and he was the only witness who was present at the incident that had not come with Jonathan that evening (those other witnesses being Jonathan, Luke, Michael, and Ashley).

{¶28} The State contends that there is no error because: (1) Wesley failed to preserve this error for review; (2) a proper foundation was not laid for the admission of extrinsic statements as required by Evid.R. 613(B); (3) Wesley failed to comply with Crim.R. 16 requiring prior disclosure of Devon's statement, so exclusion was appropriate; and, (4) in any event, the exclusion of the statement was harmless error beyond a reasonable doubt. Based on the record before us, we agree with several of the State's claims.

{¶29} First, we must agree that Wesley failed to properly preserve this error for review. There is no indication in the record that suggests that Wesley ever attempted to call Ms. Ruffing to the stand in an attempt to introduce this extrinsic evidence. Similarly, there is no record where the trial court prohibited the introduction of this testimony, or, if so, the basis for such a ruling.

{¶30} It is true that counsel proffered Ms. Ruffing's limited testimony, so something must have occurred to precipitate this action. However, the reason for the proffer is unstated on the record. Wesley's appellate counsel acknowledges

that "what is not clear from the record is exactly why this testimony had to be proffered." (App. Br. 8) Counsel states that "for a variety of reasons, including the malfunctioning of the trial court's recording equipment, the exact basis of the trial court's ruling is not clearly set forth from the record." (*Id.* at 7). The State denies that this was true, and correctly asserts that if the trial court made any decisions at the bench to which defense objected, it was incumbent upon defense counsel to object to such rulings on the record." (Appellee's Br., p. 10)

{¶31} The only reference in the record was to a discussion held outside of the presence of the jury, just prior to the defendants' resting their case, wherein defense counsel referenced a prior discussion, held off the record, "relative to reconsideration of the ruling on the Rule 16 issues, particular as it relates to the testimony of Devon Kiss and the ability for us to call our investigator to testify that he had previously given a different version of events when she interviewed him." (Tr. 8/26, pp. 4-5) Defense counsel informed the trial court that it had proffered Ms. Ruffing's testimony the previous day

{¶32} The duty to provide a transcript for appellate review falls upon the appellant. *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199 (1980). "This is necessarily so because an appellant bears the burden of showing error by reference to matters in the record." *Id.*, *citing State v. Skaggs*, 53 Ohio St.2d 162 (1978). *See, also*, App.R. 9. "When portions of the transcript necessary for

resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm." *Knapp* at 199.

{¶33} This Court finds the absence of a definitive record on this important issue to be troubling, especially since it is clear that *something* occurred below, given that testimony was proffered, and references were made to the issue during discussions held with the trial court prior to closing arguments and during sentencing.  However, unless the record transmitted on appeal affirmatively demonstrates error, this court must presume the trial court committed no error. *See Roberts v. Payton*, 105 Ohio App.3d 597 (11th Dist.1995).

{¶34} However, even if we were to presume that sufficient references were included in record to allow this Court to rule on the merits of Wesley's argument, we find we would still overrule this assignment of error.  Before extrinsic evidence is admissible to impeach a witness, a party must comply with Evid.R.613(B). Evid.R. 613(B) states, in part, that extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:

> (1)   If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;

(2)  The subject matter of the statement is one of the following:

(a)  A fact that is of consequence to the determination of the action other than the credibility of a witness

(b)  A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(A), or 616(B);

(c)  A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.

**{¶35}** The record does not demonstrate that Wesley complied with Evid.R. 16(B)(1).  During cross examination, he merely asked Devon whether or not he had ever stated that Tory Stover was the only person he saw kicking Jonathan, to which he replied in the negative.  (Tr. 8/24, p. 241)  It was not until after the jury was dismissed for the day that defense counsel proffered a detailed foundation with Devon that would have been necessary before extrinsic evidence from Ms. Ruffing could have been offered for impeachment purposes.  There is no indication given as to why Devon was not questioned about this matter on the record and in front of the jury while he was being cross-examined, or why this witness's testimony was proffered off the record, rather than merely having him recalled to set the necessary foundation.  Devon was not given the opportunity to explain or deny the inconsistent statement on the record, and the State was not given the opportunity to interrogate him concerning the statement.  Therefore, the trial court's decision to exclude the extrinsic evidence may have been based upon

this issue. Although, without a record of the court's discussion and ruling, we do not know what occurred.

**{¶36}** Likewise, although we believe Wesley has raised some valid concerns about the application of Crim.R. 16 under these circumstances, we must decline to rule on this matter. Without a record before us that gives us more information as to exactly what the trial court's ruling was, and what it was based upon, any further review on our part would be based purely on speculation.

**{¶37}** However, *even if* all of the above issues had not been present, and even if we would have found that the exclusion of the extrinsic evidence was in error, we find that it would have been harmless error. There were *four other witnesses* who testified that they saw, or were aware of the fact, that Wesley and Mr. Brofford had participated in kicking Jonathan. Even without Devon's testimony, there was more than sufficient evidence to support Wesley's conviction.

**{¶38}** The record does not support Wesley's assertion that Devon's testimony was more significant because he was not affiliated with the group that came with Jonathan and, therefore, the jury would not perceived him to be biased. *All* of the young men and women had testified that they were friends with most of those who were present, including Jonathan being friends with Nick, Tory, Devon, and others. Devon and Taylor were boyfriend and girlfriend (Tr. 8/23, p. 119) and

Jonathan was dating Devon's sister (*Id.* at 89). Therefore, the record does not indicate there was any reason for the jury to believe that Devon would have any less bias than any of the other witnesses.

{¶39} And finally, we do not find that the testimony of Ms. Ruffing was definitive in impeaching Devon's testimony. We note that Ms. Ruffing never testified that Devon said that he *did not see* Wesley kick Jonathan. Rather, she testified that, at some unidentified point in time during some unidentified conversation, Devon did not mention anyone but Tory Stover as an assailant. We do not know what questions were posed to Devon, or in what context his statement may have been made.

{¶40} Although this assignment of error represents that Ms. Ruffing's statement was that Devon had said "he had *only* seen Tory Stover kick Jonathan," that is not an accurate representation of the investigator's proffered testimony. She did not say that Devon had definitely stated that he had not seen anyone else kicking Jonathan; she merely said that he had not mentioned anyone else. Without knowing more about the context and details of the alleged statement, her proffer does not definitively impeach Devon's testimony. Therefore, given all of the other evidence against Wesley, and the inconclusiveness of Ms. Ruffing's supposed impeachment testimony, the exclusion of her testimony would have been harmless error, if it had been error at all.

{¶41} Accordingly, for all of the above reasons, Wesley's assignment of error is overruled.

{¶42} Having found no error prejudicial to the Appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS and SHAW, J.J., concur.**

**/jlr**